## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. Mark Falk |
| v. | : | |
| | : | |
| JEFFREY BENNETT, | : | Mag. No. 20-1089 |
| a/k/a "Biz," | : | |
| JANEL BLACKMAN, | : | |
| TASHON RAGAN, | : | **CRIMINAL COMPLAINT** |
| a/k/a "Ta," and | : | |
| JAHAAD FLIP | : | |

I, Ryan Gale, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Postal Inspector with the United States Postal Inspection Service and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Ryan Gale, Postal Inspector
United States Postal Inspection Service

*Postal Inspector Gale attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

Sworn to and subscribed via telephone,
This 16th day of September, 2020

ESSEX COUNTY, NEW JERSEY
County and State

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Conspiracy to Commit Bank Fraud)

From in or about February 2019 to in or about May 2020, in Essex and Union Counties, in the District of New Jersey, and elsewhere, defendants

JEFFREY BENNETT,
a/k/a "Biz,"
JANEL BLACKMAN,
TASHON RAGAN,
a/k/a "Ta," and
JAHAAD FLIP

knowingly and intentionally did conspire and agree with each other and others to execute a scheme and artifice to defraud financial institutions as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation and whose accounts were insured by the National Credit Union Insurance Fund, and to obtain monies, funds, assets, and other property owned by and under the custody and control of such financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

1

## Count Two
### (Aggravated Identity Theft)

On about May 9, 2020, in Union County, in the District of New Jersey, and elsewhere, defendant

TASHON RAGAN,
a/k/a "Ta,"

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another individual, namely, a debit card and personal identification number for an account at Affinity Credit Union held by Individual 1, during and in relation to a felony violation of a provision contained in Chapter 63 of the United States Code, that is, conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349 as charged in Count One of this Complaint, knowing that the means of identification belonged to another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1), and Section 2.

2

## Count Three
### (Passing Fictitious Obligations)

On or about May 9, 2020, in Union County, in the District of New Jersey, and elsewhere, defendants

TASHON RAGAN,
a/k/a "Ta," and
JAHAAD FLIP

did, with the intent to defraud, pass, utter, present, and offer, and attempt to do the same, within the United States false and fictitious instruments, and other items, namely, counterfeit Economic Impact Payment checks, appearing, representing, purporting, and contriving through scheme and artifice to be actual securities and other financial instruments issued under the authority of the United States Department of Treasury.

In violation of Title 18, United States Code, Sections 514(a)(2) and 2.

## Count Four
### (Aggravated Identity Theft)

On or about May 16, 2020, in Monmouth County, in the District of New Jersey, and elsewhere, defendant

JEFFREY BENNETT,
a/k/a "Biz,"

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another individual, namely a credit card issued by PNC Bank and a driver's license, both in Accountholder 8's name, during and in relation to a felony violation of a provision contained in Chapter 63 of the United States Code, that is, conspiracy to commit bank fraud in violation of Title 18, United States Code, Section 1349 as charged in Count One of this Complaint, knowing that the means of identification belonged to another actual person.

In violation of Title 18, United States Code, Section 1028A(a)(1), and Section 2.

4

**ATTACHMENT B**

I, Ryan Gale, a Postal Inspector with the United States Postal Inspection Service, having personally participated in an investigation of the conduct of defendants JEFFREY BENNETT, a/k/a "Biz" ("BENNETT"), JANEL BLACKMAN ("BLACKMAN"), TASHON RAGAN, a/k/a "Ta" ("RAGAN"), JAHAAD FLIP ("FLIP"), and others, and having spoken with other law enforcement officers and individuals, have knowledge of the following facts. Because this Complaint is submitted for the limited purpose of establishing probable cause, I have not included all facts known to me concerning this investigation. The contents of documents and the statements and conversations of individuals referenced below are provided in substance and in part, unless otherwise indicated.

**Relevant Individuals and Entities**

1.      At various times relevant to this Criminal Complaint:

      a.      BENNETT was a resident of Irvington, New Jersey.

      b.      BLACKMAN was a resident of Newark, New Jersey, and employed as a clerk at the U.S. Post Office ("PO") in Summit, New Jersey.

      c.      RAGAN was a resident of Hillside, New Jersey.

      d.      FLIP was a resident of Newark.

      e.      "USPS Employee 1" was employed as a clerk at the Summit PO.

      f.      "USPS Employee 2" was an assistant mail carrier at a United States Postal Service ("USPS") processing plant in Kearny, New Jersey.

      g.      "USPS Supervisor 1" was the top supervisory official at the Summit PO.

      h.      Individual 1 was a resident of Newark.

      i.      Individual 2 was a resident of Newark.

      j.      Individual 3 was a resident of Union, New Jersey.

      k.      Individual 4 was a resident of Jersey City, New Jersey.

      l.      Student 1 was a student at a New Jersey High School ("NJHS").

      m.      Student 2 was a student at an NJHS.

5

n.      Accountholder 1 was a resident of Summit and held an account at Peapack-Gladstone Bank ("Peapack").

o.      Accountholder 2 was a resident of New Providence and held an account at Bank of America, N.A. ("BOA").

p.      Accountholder 3 was a resident of Westfield, New Jersey, and held an account at TD Bank, N.A. ("TD Bank").

q.      Accountholders 4 and 5 were residents of New Providence, New Jersey, and held a joint account at Affinity Credit Union ("Affinity").

r.      Accountholders 6 and 7 were residents of New Providence, and held a joint account at TD Bank.

s.      Accountholder 8 was a resident of Secaucus, New Jersey, and held a bank account at PNC Bank, N.A. ("PNC").

t.      J.P. Morgan Chase Bank, N.A. ("Chase"), Wells Fargo, N.A. ("Wells Fargo"), PNC, BOA, TD Bank, Affinity, and Peapack were "financial institutions" whose deposits were insured by the Federal Deposit Insurance Corporation or whose accounts were insured by the National Credit Union Insurance Fund.

## Overview of the Conspiracy

2.      The investigation to date has shown that from at least in or about February 2019 to at least in or about May 2020, a group that referred to themselves as the "Members" and their associates, including BENNETT, FLIP, and RAGAN, conspired to solicit and did solicit USPS employees, including BLACKMAN and USPS Employees 1 and 2, to steal U.S. mail containing checks, checkbooks, debit cards, and credit cards in exchange for cash.

3.      Once they received stolen checks, for instance, the Members and others fraudulently forged the signatures of the accountholders and negotiated the checks by making them payable to individuals, some of whom were NJHS students, who had given the Members and others access to their accounts, also in exchange for cash. The Members and others would then attempt to deposit the fraudulent checks online and at various bank ATMs throughout New Jersey and later withdraw funds from the bank accounts before the victim banks could flag the fraud and decline the checks. The Members also would use the stolen credit cards to purchase gift cards and Apple products which they would resell to generate additional proceeds from the scheme. The Members then would split the proceeds of the fraud among themselves.

4.      The investigation also has revealed that RAGAN, FLIP, and others deposited and attempted to deposit thousands of dollars of counterfeit

6

Economic Impact Payment ("EIP") checks issued by the United States Department of Treasury ("Treasury") pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The Cares Act authorized EIP payments structured as one-time refundable tax credits to certain eligible taxpayers of $1,200 for individuals, $2,400 for married couples filing jointly, and up to $500 for each qualifying child. The goal of the EIP check fraud was to induce the victim banks into crediting the accounts with money based on the amounts of the counterfeit EIP checks and to then withdraw as much of the money from the victim banks as possible before Treasury or the victim banks identified the EIP checks as counterfeit. In this way, RAGAN, FLIP, and others defrauded and attempted to defraud, not only the victim banks, but also the United States, which funded the EIP checks for the purpose of providing relief to taxpayers during the COVID-19 pandemic.

### The Members Bribed USPS Employees to Obtain Stolen Checks and Credit Cards from the Mail

5.    In or about November 2019, law enforcement received reports of multiple complaints from residents of Summit and New Providence that they ordered checkbooks in the mail from their banks and credit unions that never arrived. The victims subsequently discovered that individuals unknown to them had attempted to negotiate fraudulent checks drawn from their bank accounts without their authorization.

6.    On or about November 27, 2019, federal law enforcement officers interviewed USPS Supervisor 1 who stated that all mail addressed to residents of Summit and New Providence was processed at the Summit PO for delivery. USPS Supervisor 1 also said that banks and credit unions generally sent blank checkbooks ordered by accountholders in distinctively marked green check mailers. BLACKMAN and USPS Employee 1, according to USPS Supervisor 1, were responsible for breaking down the deliveries that contained blank checkbooks intended for delivery to New Providence and Summit addresses.

7.    Law enforcement reviewed tracking information for approximately seven packages of checks that were reported as stolen by victims in Summit and New Providence. Data obtained from the Summit PO Time and Attendance Control System ("TACS") showed that USPS Employee 1 was on duty during all of the days and times when the seven packages arrived at the Summit PO. TACS data also showed that BLACKMAN was on duty for most, but not all, of the days when the packages of checks were reported as missing.

8.    On or about July 22, 2020, law enforcement interviewed USPS Employee 1. During the interview, USPS Employee 1 admitted that USPS Employee 1 had been stealing checkbooks from the mail in exchange for cash payments. USPS Employee 1 said that BLACKMAN had approached USPS Employee 1 approximately one year prior and told USPS Employee 1 about a

scheme to steal checks from the mail and pass them off to BLACKMAN's son, "Jahaad," an individual named "Ta," and another individual, "Biz." The investigation has revealed that BLACKMAN's son is FLIP, Tashon RAGAN refers to himself by the nickname "Ta," and BENNETT refers to himself as "Biz." USPS Employee 1 said that USPS Employee 1 had participated in the scheme for about a year and generally received approximately $100 in cash per package of stolen checks, which cash BLACKMAN and USPS Employee 1 split.

9.     Law enforcement has reviewed text messages obtained from USPS Employee 1's phone in which USPS Employee 1 referenced stealing credit cards and checks from the mail with a "coworker," whom I believe to be BLACKMAN based on the investigation. For example, on or about October 28, 2019, USPS Employee 1 sent a text message to an individual referred to in USPS Employee 1's phone as "John," stating, "I got a card but my coworker got it for me so what I get she gotta get too." Based on my training, experience, and knowledge of the investigation, I believe that USPS Employee 1 was saying that USPS Employee 1 had a stolen credit card to sell to John but that because USPS Employee 1's co-worker BLACKMAN had obtained it, USPS Employee 1 would have to split any proceeds from the sale with BLACKMAN. USPS Employee 1 added in a text later the same day, "Did u call ya friend to see what he can do with the checks or card?" John responded, "Cuz made the call." USPS Employee 1 then reiterated, "I told u my coworker gave me that card she was supposed to give that to her ppls [peoples] I convinced her to give it to me to give to u so if I'm askin a question it's [sic] needs to be answered or this will be the first and last time I give u anything." Based on my training, experience, and knowledge of the investigation, I believe USPS Employee 1 was telling John that BLACKMAN was supposed to give the stolen credit card to BLACKMAN's "peoples"—likely referring to FLIP, BENNETT, and RAGAN—but USPS Employee 1 convinced BLACKMAN to give the stolen card to USPS Employee 1 instead so that USPS Employee 1 could give it to John. John responded, "[W]e speak in person about this kind of thing . . . . We don't talk over these [sic] phone bout any jobs."

### The Members Solicited USPS Employees to Steal Mail in Exchange for Payments

10.     The investigation has also revealed that BENNETT and other Members explicitly solicited USPS employees—and successfully recruited them—to steal mail in exchange for payments.

11.     For example, on or about November 27, 2019, BENNETT posted a "story," or 24-hour, temporary post, to BENNETT's Instagram account, stating, "Postal workers get with me," with a cartoon icon, commonly known as an "emoji," of a face with money signs for eyes, sticking out a green tongue bearing another money sign. The same day, USPS Employee 2 sent a message to BENNETT of an emoji of two eyes and asking him "Wat u need." BENNETT

responded to USPS Employee 2 asking, "Lol you work there," with an emoji of
two eyes.  USPS Employee 2 responded, "Would've [sic] asked if I didn't."
BENNETT replied, "Then checks written out on already lol & you gotta get the
packs not just 1 single paper & the credit cards suppose[d] to be on a paper
with the person name on it & all that not just out."  In these communications,
BENNETT was instructing USPS Employee 2 what to steal from the mail,
including checks made out to a payee, blank checkbooks, and new credit cards
issued by financial institutions to a credit card holder.  On or about May 10,
2020, BENNETT asked, "do you got like the green packs or blue ones?  N*****
don't buy 1 separate book we buy packs," meaning that BENNETT was only
interested in unopened checkbook packages and not loose checkbooks.  USPS
Employee 2 responded, "I have the packs" and "Blue and green."  BENNETT
said he would "get some off you tomorrow."  A review of Instagram
communications reveals that on or about May 14, 2020, USPS Employee 2 told
BENNETT that she "have it in my car," referring to the checkbook packages.
BENNETT asked where USPS Employee 2 worked and told her he was "bout to
jump in the shower & come," meaning that he would meet her to pick up the
checkbook packages.  USPS Employee 2 responded with her phone number
and said she worked at "Post office Kearny by walmart."  She added, "make
sure NONE of ya friends know u got them from me."  BENNETT replied, "Girl I
don't let my n***** know my plugs shut up I got you lol," promising he would
not share that USPS Employee 2 stole mail for him with anyone else.  USPS
Employee 2 said that she was "on lunch now & my next break not gonna be
until like 3:30-4:00 so just call me when u ready," telling BENNETT the best
time to meet.

      12.    I have also reviewed group Instagram chats exchanged among the
Members, including BENNETT and RAGAN, in which the Members repeatedly
reference obtaining "plugs."  Based on my review of these communications and
knowledge of the investigation, the Members sometimes use the term "plugs" to
refer to USPS postal workers whom they have convinced to steal checks and
credit cards from the mail on their behalf.  For example, on or about November
29, 2019, an Instagram account associated with Individual 2 wrote to the
Members, "My po b**** moving like a snail," referring to a postal worker who
was stealing mail for him.  Individual 1 responded, "Pay your plug son," later
adding, "That's good plug keep them in headlock they rare."  BENNETT
responded, "Yessssss," adding a dollar sign emoji.  Based on my review of these
communications and my knowledge of the investigation, I believe Individual 2
was telling the Members that the post office worker he recruited into the
scheme was not moving quickly enough in stealing checks and credit cards.
Individual 1 and BENNETT suggested to Individual 2 that he pay his postal
worker in order to motivate her to steal mail and credit cards more quickly.

## The Members Recruited Complicit Accountholders
## to Deposit Fraudulent Checks

13.     I have reviewed numerous chats in which the Members, including BENNETT and RAGAN, and others, solicited accountholders at various financial institutions, including NJHS students, to provide their banking information to the Members in exchange for the promise of cash.  The Members intended to and did use the names of the accountholders to negotiate stolen checks, deposit the stolen checks, and then attempt to withdraw money from the accounts and to transfer money to themselves and their co-conspirators.  By using the account information of others to deposit stolen checks, the Members concealed their identities from the victim banks in which they deposited the stolen money and thereby furthered their deception.

14.     For example, on or about January 30, 2020, BENNETT posted a story to his Instagram account with floating text stating, "Bank of America ON SPOT," "Wells Fargo ON SPOT," and "Who Wanna Cashout Real Fast?"  On or about the same day, BENNETT posted another story of a picture of a Wells Fargo ATM receipt showing an available balance of approximately $1,636.02, and a caption reading, "Got 0$ give me ya wells," with an emoji of a wizard.

15.     The investigation also has revealed that RAGAN used intermediaries, including Student 2, to recruit students from an NJHS to provide banking information to RAGAN in exchange for cash.  For example, on or about October 29, 2019, Student 2 messaged RAGAN on Instagram, copying Student 1, "yo crodie cuhz got wells," referring to the fact that Student 1 had a Wells Fargo account available to deposit stolen checks.  Student 1 at first expressed reservations, asking RAGAN, "yo u sure it's not gon show it in my transactions."  RAGAN reassured Student 1, "I'm telling u it's not cus."  To further entice Student 1, RAGAN added, "U must not know who I am," and appended a photo of a receipt from Wells Fargo, dated on or about October 28, 2019, showing a deposit of approximately $1,322.60 into the account.  When Student 1 continued to express reservations about giving Student 1's account over to RAGAN, RAGAN complained to Student 2, "Bringing me all these n***** who scared to make money," commenting that Student 2 had introduced him to Student 1 and other accountholders who had similar reservations.  Based on RAGAN's false reassurances, Student 1 provided RAGAN with Student 1's banking information over Instagram.  On or about November 1, 2019, using Student 1's banking information, RAGAN caused a stolen check from Accountholder 1's account in the approximate amount of $399 to be deposited into Student 1's Wells Fargo account.  Accountholder 1 had previously reported to law enforcement that Accountholder 1 ordered blank checks in the mail that never arrived to Accountholder 1's Summit residence.  The check was later returned as fraudulent.

10

## The Members Deposited Stolen Checks

16.    I have reviewed numerous Instagram communications in which BENNETT and RAGAN discuss depositing fraudulent checks and withdrawing the proceeds of the fraud online and at various ATMs.  The investigation later revealed that RAGAN, BENNETT, and others did in fact deposit fraudulent checks stolen from the mail of New Providence and Summit residents whose mail was processed at the Summit PO by clerks, including BLACKMAN and USPS Employee 1.

17.    For example, on or about September 6, 2019, BENNETT asked RAGAN, "where the funds lmao keep showing available son."  RAGAN responded, "LMAO why u ain't say none when I showed Funds off my last Chevy."  RAGAN then sent a picture of a receipt of a withdrawal from a savings account at Chase (also known as "Chevy") of approximately $5,500.  Based on my training, experience, and knowledge of the investigation, I believe RAGAN was telling BENNETT that he successfully withdrew $5,500 from a Chase account in proceeds from depositing fraudulent checks and showed BENNETT the receipt as proof of the transaction.

18.    Similarly, on or about October 23, 2019, BENNETT messaged another Member, "Getting V so I could see wassup with these wells w ta wya."  Based on my training, experience, and knowledge of the investigation, I believe BENNETT was saying that he was getting a vehicle ("V") to pick up RAGAN ("Ta") so that the two of them could go to Wells Fargo to deposit fraudulent checks.

19.    Law enforcement reviewed October 23, 2019 surveillance footage from a Wells Fargo ATM located in Newark, which recorded two individuals, one with dreadlocks and the other with a gray hooded Puma sweatshirt, depositing at least two checks, each in the amount of approximately $399, drawn from the Bank of America account of Accountholder 2, a New Providence resident, and made payable to Individual 3.  Based on a review of National Crime Information Center reports, Department of Motor Vehicle ("DMV") records, social media applications, and other sources, law enforcement has identified the individuals in the photos as RAGAN and BENNETT.  In or about November 2019, Accountholder 2 reported to law enforcement that Accountholder 2 ordered checkbooks from Bank of America that were never delivered to Accountholder 2's New Providence residence and subsequently observed fraudulent activity in Accountholder 2's bank account. Records from Wells Fargo indicate that between on or about October 22, 2019 and on or about October 24, 2019, a phone associated with RAGAN was used to access Individual 3's online bank accounts approximately seven times.

20.    Bank records from Wells Fargo, including ATM surveillance footage, showed that on or about October 2, 2019, BENNETT deposited another

check drawn from Accountholder 2's account in the amount of approximately $399 into a bank account held by Individual 4. Banking records, also including ATM surveillance footage, showed that on or about October 3, 2019, RAGAN, wearing a gray hooded sweatshirt attempted to deposit approximately three checks in the amount of approximately $599, $699, and $899, respectively, from the TD Bank account of Accountholder 3, which checks were later returned as unpaid.

### The Members Deposited Counterfeit EIP Checks

21.    A review of Instagram communications showed that on or about May 1, 2020, Student 1 provided to RAGAN online banking information for a second account at Affinity held in the name of Student 1, including a personal identification number ("PIN"), username, and password. On or about May 21, 2020, law enforcement interviewed Student 1, who said that Student 1 provided a debit card for the same Affinity account to two individuals in an older model Black BMW SUV. The investigation showed that RAGAN, FLIP, and a co-conspirator used Student 1's account and banking information, including his debit card and PIN, to deposit counterfeit EIP checks and fraudulent checks stolen from mail of New Providence and Summit residents.

22.    Law enforcement reviewed surveillance photographs dated on or about May 3, 2020 of an ATM at an Affinity branch located in New Providence, approximately two days after RAGAN obtained Student 1's bank information for an Affinity account, including PIN, over Instagram. The photographs showed an individual in a gray Puma hooded sweatshirt walk up to the ATM and obtain a receipt. Affinity banking records indicated that an individual conducted a balance inquiry of Student 1's Affinity account at the same ATM on or about May 3, 2020, using Student 1's debit card and PIN to access the account. Based on a review of photos from DMV records, other ATM footage of RAGAN depositing fraudulent checks, and law enforcement's knowledge of the investigation, law enforcement has identified the individual depicted in the surveillance photographs as RAGAN.

23.    On or about May 4, 2020, surveillance footage from the same Affinity ATM location captured RAGAN, wearing the same gray Puma sweatshirt and a face mask, with an unidentified individual, also wearing a face mask, manually depositing a purported EIP check made payable to Student 1 in the approximate amount of $3,890, using Student 1's PIN and debit card. Based on a review of the check image, bank records, and IRS records, law enforcement has determined that the EIP check bore the same unique identifiers as a legitimate EIP check issued to FLIP in the amount of $1,200 on or about April 24, 2020 (the "Flip EIP Check."). Specifically, the check deposited bears the same unique serial number ending in 1440, inventory control number ("ICN") ending in 698, and print sequence number

("PSN") ending in 7564 as the Flip EIP check.[1]  Based on my training, experience, and knowledge of the investigation, it is likely that the purported EIP check deposited by RAGAN and a co-conspirator was counterfeit and that information obtained from the FLIP EIP check was used to create the counterfeit EIP check.

24.     On or about May 9, 2020, surveillance footage from the same Affinity ATM showed RAGAN, this time wearing a surgical mask and a different branded gray sweatshirt, and an individual wearing a red hooded sweatshirt and a white skull cap.  Based on my review of photos obtained from DMV records and other sources, and on my knowledge of the investigation, law enforcement believes the individual pictured next to RAGAN at the ATM was FLIP.  Telephone records from RAGAN's phone show calls with Student 1 on or about May 9, 2020, at around the times of the ATM deposits of fraudulent checks depicted in the surveillance footage.

25.     In the surveillance footage, RAGAN manually attempted to deposit approximately four purported EIP checks and four personal checks totaling approximately $7,596 into the Affinity ATM, using Student 1's PIN and debit card.  FLIP stood next to RAGAN, looked several times into the bank branch, monitored the ATM screen while RAGAN used the ATM, occasionally spoke to RAGAN, and assisted RAGAN by holding the fraudulent checks and reviewing the transaction receipts.

26.     Law enforcement reviewed copies of the four EIP checks deposited by RAGAN and FLIP into Student 1's account.  Each EIP check was made payable to Student 1 in the approximate amount of $1,200 and bore the same serial number ending in 1440, ICN ending in 698, and PSN ending in 7564 as the Flip EIP Check.  Because each EIP check contained the same unique identifiers as the FLIP EIP Check, it is likely that each of the EIP checks was counterfeit and produced using the legitimate FLIP EIP check.

27.     In addition to the four counterfeit EIP checks, RAGAN and FLIP deposited four personal checks into Student 1's account, each of which was made payable to Student 1 in the amount of $699.  Two of the checks were drawn from the joint Affinity account of Accountholders 4 and 5.  The other two checks were drawn from the joint TD Bank account of Accountholders 6 and 7.  On or about July 7, 2020, law enforcement interviewed Accountholders 4, 5, and 6, each of whom told law enforcement that they ordered blank checks in the mail to their New Providence addresses that never arrived.  They also confirmed that they never authorized or signed any checks made payable to

---

[1] As security features, each EIP check issued by Treasury contains a unique serial number, ICN, and PSN.  There are therefore, no EIP checks with same serial number, ICN, or PSN.

Student 1 and were forced to close their accounts after being notified of the fraudulent activity.

### BENNETT Used Stolen Credit Cards and Other Forms of Identification Without Lawful Authorization

28.     On or about June 23, 2020, Little Falls, New Jersey, Police Department ("LFPD") responded to a Jeep/Chrysler/Dodge dealership after receiving a report that a white Jeep Grand Cherokee with no license plate had been abandoned at the dealership.  According to LFPD reports, pursuant to a lawful search of the car, law enforcement recovered, among other items, several fraudulent driver's licenses (all of which were in different names but many of which had the same picture), stolen credit cards and checks, a Bank of America withdrawal receipt, and several cell phones.  In particular, one of the stolen credit cards was issued by PNC Bank to Accountholder 8 but matched a fake driver's license in Accountholder 8's name and bearing BENNETT's picture.  Bank records provided by Accountholder 8 showed that on or about May 20, 2020, the stolen PNC credit card was used for a $205.95 purchase at a Walgreens in Newark and for a $505.95 purchase at a different Walgreens in East Orange, New Jersey.  Based on my training, experience, and knowledge of the investigation, including that gift card purchases often include a service charge of approximately $5.95 in addition to the value of the gift card, I believe that BENNETT used the stolen credit card to purchase gift cards.  In addition, the stolen PNC credit card was used in connection with two attempted purchases and one successful purchase of Apple products at Best Buy. Specifically, on or about May 16, 2020, the stolen PNC credit card in Accountholder 8's name was used to purchase a 13-inch Apple MacBook Pro online for approximately $1,812.61, which was later picked up in person at a Best Buy in Holmdel, New Jersey, likely by BENNETT, using the fake driver's license in Accountholder 8's name and bearing BENNETT's picture.